1
 2026 CO 41 The People of the State of Colorado, Plaintiff-Appellant v. Troy J. Baker, Defendant-Appellee No. 25SA344Supreme Court of Colorado, En BancJune 1, 2026
          In this
 C.A.R. 4.1 interlocutory appeal, the supreme court reverses
 the district court's order suppressing evidence from a
 protective sweep and search of the vehicle in which the
 defendant was a passenger. The court concludes that the
 officers acted within the bounds of both the United States
 and Colorado Constitutions: the protective sweep was
 justified by officer-safety concerns, and the vehicle search
 fell within the automobile exception. The case is remanded to
 the district court for further proceedings.
 
 2
 
          
 Interlocutory Appeal from the District Court District Court,
 City and County of Denver, Case No. 25CR831 Honorable Karen
 L. Brody, Judge
 
 
          
 Attorneys for Plaintiff-Appellant: John Walsh, District
 Attorney, Second Judicial District Jeff M. Van der Veer,
 Senior Deputy District Attorney Denver, Colorado
 
 
          
 Attorneys for Defendant-Appellee: Megan A. Ring, Public
 Defender Julia Jones, Deputy Public Defender Denver, Colorado
 
 3
 
          
 JUSTICE BLANCO delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE GABRIEL, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.
 
 4
 
          
 OPINION
 
 
           BLANCO
 JUSTICE
 
 
          ¶1
 Troy J. Baker was charged with one count of possession with
 intent to distribute fentanyl and methamphetamine and two
 counts of possession of a weapon by a previous offender
 ("POWPO"). Before trial, Baker moved to suppress
 evidence that he alleged the police had obtained in violation
 of the Fourth Amendment to the U.S. Constitution and article
 II, section 7 of the Colorado Constitution. The district
 court agreed and suppressed the evidence in question. Because
 we conclude that the search was within the limits of both the
 U.S. and Colorado Constitutions, we reverse the district
 court's order.[1]
 
 
          I.
 Facts and Procedural History
 
 
          ¶2
 At 10:03 p.m. on a Sunday night, two police officers pulled
 over a black Toyota ("the Toyota") after noticing
 it did not have a front license plate. Before leaving their
 patrol car, the officers saw the Toyota's driver,
 Rachelle Herrera, and its front seat passenger, Baker, moving
 their arms back and forth with their elbows above their
 shoulders. This was a high-crime area, and the officers were
 already
 
 5
 
 looking for drug and gun activity when they witnessed what
 they believed to be these "furtive movements." The
 officers called for additional officer coverage.
 
 
          ¶3
 At 10:04 p.m., the officers approached the Toyota and
 obtained the names of the occupants. One minute later, at
 10:05 p.m., one officer stayed with the Toyota while the
 other officer returned to the patrol car to run both
 occupants' names through a database. Through the search,
 the officer discovered that Baker had recently been arrested
 for POWPO. By 10:07 p.m., when the officer exited the patrol
 car, the additional officer coverage had arrived.
 
 
          ¶4
 The officers then removed Baker from the Toyota at 10:08 p.m.
 An officer patted him down and asked if he had a gun, to
 which Baker responded that he did not. Less than one minute
 after Baker was removed, officers searched the passenger
 compartment where Baker had been seated, and by 10:10 p.m.,
 they found a handgun under the front passenger seat that
 Baker had occupied.
 
 
          ¶5
 After finding the handgun, police officers searched the rest
 of the Toyota. Within three minutes, at 10:13 p.m., the
 officers found a black bag in the backseat containing a large
 amount of fentanyl pills and methamphetamine. The officers
 also found a red purse on the driver's side floorboard
 containing more fentanyl pills.
 
 
          ¶6
 It is worth noting that the entire sequence of events lasted
 approximately ten minutes.
 
 6
 
          ¶7
 Baker was charged with one count of possession with intent to
 distribute fentanyl and methamphetamine and two counts of
 POWPO. Baker's sentencing range was increased by a
 special offender enhancement for possessing a handgun in
 connection with drugs and by habitual sentencing ranges that
 applied due to his alleged criminal history.
 
 
          ¶8
 Baker filed a pretrial motion to suppress the evidence seized
 from the Toyota, arguing that the search violated his Fourth
 Amendment rights. He alleged that the officers did not have a
 reasonable belief that he was armed and dangerous when they
 began the search; therefore, they lacked justification for
 their initial search that revealed the handgun. Further,
 Baker contested that the subsequent warrantless search of the
 Toyota that uncovered the drugs was unconstitutional because
 it did not fall under the automobile exception.
 
 
          ¶9
 The district court held a suppression hearing and heard
 testimony from the officers involved in the stop and search.
 The officers testified that they observed what they
 characterized as abnormal or furtive movements in the Toyota
 as they pulled the vehicle over. The district court found
 that during the stop, one officer asked, "[W]hat are
 they moving?" and later stated into the radio that the
 occupants were making "furtive movements."
 People v. Baker, No. 25CR831, at 3 (Dist.
 Ct., City &Cnty. of Denver, Nov. 23, 2025) (unpublished
 order). The officers testified that it appeared as if Herrera
 and Baker were throwing items into the backseat.
 
 7
 
 Further, they testified that based on their training and
 experience, these movements could mean the vehicle contained
 contraband. The district court found that the officers may
 have observed movement, but that their observations
 consisted, at most, of unspecified movements, with each
 occupant of the vehicle raising an elbow above their
 shoulder. Id. at 4. The district court was not
 persuaded by the officers' testimony that this movement
 was "furtive" or gave rise to sufficient fear to
 warrant a protective sweep or the subsequent search of the
 Toyota. Id. at 15-17.
 
 
          ¶10
 The district court concluded that the officers had a legal
 basis for stopping the Toyota based on the missing front
 license plate. Id. at 7. However, it further found
 that the investigatory detention "lasted longer than was
 necessary to effectuate the purpose of the stop" given
 that the stop was based on the missing license plate.
 Id. at 10. Finally, the district court found that
 the detention "was not carefully tailored to its
 underlying justification," and ultimately, the
 protective search was not justified because of a "lack
 of specific and articulable facts supporting a reasonable
 belief that Herrera and Baker were potentially
 dangerous." Id. at 10, 17.
 
 
          ¶11
 The prosecution filed an interlocutory appeal requesting that
 we reverse the suppression order.
 
 8
 
          II.
 Analysis
 
 
          ¶12
 The Fourth Amendment to the U.S. Constitution and article II,
 section 7 of the Colorado Constitution protect individuals
 against unreasonable searches and seizures. U.S. Const.
 amend. IV; Colo. Const. art. II, § 7. The determination
 of whether a search was reasonable "depends upon the
 reason for and the extent of the intrusion." People
 v. Archuleta, 980 P.2d 509, 512 (Colo. 1999).
 
 
          ¶13
 We begin by setting forth the applicable standard of review.
 We next examine the guidelines set by this court and the
 United States Supreme Court for police compliance with these
 constitutional protections. Finally, we analyze each step of
 the interaction in this case: the initial stop, the
 protective sweep, and the search of the Toyota.
 
 
          A.
 Standard of Review
 
 
          ¶14
 We review a suppression order as a mixed question of law and
 fact. People v. Dacus, 2024 CO 51, ¶ 23, 559
 P.3d 198, 203. We accept the trial court's findings of
 fact so long as they are supported by competent evidence.
 People v. Barnett, 2024 CO 73, ¶ 13, 559 P.3d
 250, 253. We review the trial court's application of the
 law to the facts under a de novo standard, considering the
 totality of the circumstances. People v. Castaneda,
 249 P.3d 1119, 1122 (Colo. 2011).
 
 9
 
          B.
 The Initial Stop
 
 
          ¶15
 Although the legitimacy of the initial stop is undisputed, it
 remains an important step in the analysis regarding the
 constitutionality of the search.
 
 
          ¶16
 An officer who pulls over a vehicle in transit is usually
 conducting an investigatory stop. People v. H.J.,
 931 P.2d 1177, 1180 (Colo. 1997). An investigatory stop is
 considered "an intermediate intrusion that may take
 place under narrowly defined circumstances." People
 v. Brant, 252 P.3d 459, 462 (Colo. 2011). An officer may
 conduct an investigatory stop if the officer has "(1) a
 reasonable suspicion that criminal activity has occurred . .
 .; (2) a reasonable objective for the intrusion; and (3) a
 reasonable connection between the scope and character of the
 intrusion and its objective." People v.
 Pacheco, 182 P.3d 1180, 1183 (Colo. 2008). A traffic
 infraction is sufficient justification for an investigatory
 stop. Brant, 252 P.3d at 462.
 
 
          ¶17
 We have previously held that, as occurred with the Toyota
 here, driving without a license plate is a traffic infraction
 sufficient to justify a vehicular stop. See People v.
 Redinger, 906 P.2d 81, 84 (Colo. 1995) (concluding that
 an officer's stop of a vehicle due to its lack of a
 license plate was a reasonable investigatory stop).
 Therefore, the district court did not err by finding that the
 officers had sufficient justification for the initial stop of
 the Toyota and its occupants.
 
 10
 
          C.
 The Protective Sweep
 
 
          ¶18
 During a traffic stop, if officers "have an articulable
 and objectively reasonable belief that a person in the car
 may be armed and dangerous, they may conduct a protective
 search of the person and the passenger area of the car."
 Brant, 252 P.3d at 462. This is due to the
 "particular hazards confronting law enforcement during
 roadside encounters with drivers and passengers of
 automobiles." People v. Delacruz, 2016 CO 76,
 ¶ 16, 384 P.3d 349, 353. Additionally, if the passenger
 makes a "furtive gesture," Brant, 252 P.3d
 at 462, then officers may search the passenger compartment so
 long as their search is "reasonably related to the
 purpose of ensuring officer safety." Delacruz,
 ¶ 14, 384 P.3d at 353. Furthermore, the "scope of a
 warrantless protective search of a vehicle's passenger
 compartment is limited to those areas in which a weapon may
 be placed or concealed." Id.
 
 
          ¶19
 The officers testified that, after pulling the Toyota over
 but before leaving the patrol car, they saw Baker and Herrera
 making strange movements with their elbows above their
 shoulders. They further stated that they found this behavior
 to be extremely abnormal and believed, based on their prior
 experience, that it could indicate an attempt to conceal
 contraband. In addition, just after these movements, the
 officers discovered that Baker had recently been arrested for
 POWPO.
 
 11
 
          ¶20
 The district court found these movements insufficient to
 warrant a protective search because the officers were unable
 to identify what, if anything, the occupants were moving.
 Baker, at 16. While we agree that an officer may not
 rely on vague or ambiguous movements to justify a protective
 sweep, officers should not have to wait for an unmistakably
 dangerous act, such as drawing a firearm, before taking steps
 to ensure their safety.
 
 
          ¶21
 Colorado law has long recognized that suspicious hand
 gestures or movements are an important factor in justifying a
 weapons search. See People v. Altman, 938 P.2d 142,
 146 (Colo. 1997) (holding that a weapons search was valid
 because the driver leaned over and made motions toward the
 bottom of his seat after being stopped by the police);
 see also People v. Melgosa, 753 P.2d 221, 225 (Colo.
 1988) (concluding that a passenger placing an object under
 his seat after being pulled over was sufficient to trigger a
 weapons search); People v. Cagle, 688 P.2d 718, 723
 (Colo. 1984) (holding that a passenger's furtive conduct
 in bending down in his seat after the police car's
 emergency lights were activated created a reasonable belief
 that he had a weapon under his seat). Accordingly,
 Baker's suspicious movements—raising his elbows
 above his shoulders—are similarly furtive.
 
 
          ¶22
 In addition to the furtive movements, the officers discovered
 Baker's recent POWPO charge prior to the sweep of the
 passenger compartment. And to further
 
 12
 
 increase their suspicion, the officers were in a high-crime
 area where one might expect to encounter a weapon. See
 People v. Clouse, 859 P.2d 228, 234 (Colo.App. 1992)
 (relying in part on the officers' presence in a
 high-crime area in concluding that the weapons search was
 constitutionally permissible).
 
 
          ¶23
 Given the furtive movements, the discovery of the POWPO
 charges, and the high-crime area, we conclude that the
 officers had a reasonable belief based on articulable facts
 that Baker could have been in possession of a weapon. See
 People v. McDaniel, 160 P.3d 247, 251 (Colo. 2007)
 ("[T]he search of the vehicle and the purse was valid
 because the officer had a reasonable belief based on
 articulable facts from the defendant's behavior that the
 defendant could have been trying to gain control of a
 weapon.").
 
 
          ¶24
 Baker further argues that the sweep could not be done in the
 name of officer safety because, by the time the officers
 performed their protective sweep and found the gun, they had
 already removed Baker from the Toyota and restrained him.
 However, "[t]he fact that an officer has physical
 control of the suspect does not necessarily negate the threat
 to officer safety" because "a suspect can still
 break away from police control and retrieve the weapon."
 Delacruz, ¶ 15, 384 P.3d at 353; see also
 Michigan v. Long, 463 U.S. 1032, 1039 (1983); People
 v. Smith, 13 P.3d 300, 308 (Colo. 2000). Accordingly,
 the officers' protective sweep was justified by officer
 safety concerns, even though Baker was already restrained.
 
 13
 
          D.
 The Vehicle Search
 
 
          ¶25
 For a search to be reasonable and within the limits of the
 U.S. and Colorado Constitutions, officers generally must
 obtain a warrant before conducting a search. People v.
 Edwards, 836 P.2d 468, 471 (Colo. 1992). However, a
 warrantless search is permitted if the situation presents
 "an exception to the warrant requirement."
 Delacruz, ¶ 13, 384 P.3d at 352. One such
 exception is the automobile exception, which "authorizes
 an officer to perform a search of an automobile if he has
 'probable cause to believe that the automobile contains
 evidence of a crime.'" People v. Allen,
 2019 CO 88, ¶ 16, 450 P.3d 724, 729 (quoting People
 v. Zuniga, 2016 CO 52, ¶ 14, 372 P.3d 1052, 1056).
 Probable cause requires a court to weigh the totality of the
 circumstances in determining "whether a 'fair
 probability exists that a search of a particular place will
 reveal contraband or evidence of a crime.'"
 People v. Cox, 2017 CO 8, ¶ 14, 401 P.3d 509,
 512 (quoting Zuniga, ¶ 16, 372 P.3d at 1057).
 
 
          ¶26
 In this case, we conclude that the officers who searched the
 Toyota acted pursuant to the automobile exception. At the
 time the officers began their search, they had already (1)
 seen furtive movements, (2) learned that Baker was recently
 charged with POWPO, and (3) found a handgun in Baker's
 passenger compartment despite his initial denial of
 possessing a weapon. These facts provided probable cause for
 the officers to believe the Toyota contained evidence
 
 14
 
 of a crime. See People v. Romero, 767 P.2d 1225,
 1228-29 (Colo. 1989) (holding that an officer had probable
 cause to search a car under the automobile exception because
 she knew the occupant was a convicted felon, suspected that
 he had a gun in the car, and saw the gun in the car).
 Therefore, the officers were lawfully conducting a search
 pursuant to the automobile exception when they discovered
 additional contraband.
 
 
          ¶27
 The district court found that the stop lasted "longer
 than was necessary to effectuate the purpose of the stop, and
 . . . was not carefully tailored to its underlying
 justification." Baker, at 10. We see the
 situation differently.
 
 
          ¶28
 As for the protective search, although we agree that the
 initial purpose of the stop was to investigate the license
 plate infraction, once officers observed furtive movements
 and learned of Baker's recent POWPO arrest, officer
 safety concerns arose and the nature and purpose of the stop
 changed. As we've established, these officer safety
 concerns justified the protective sweep. The protective sweep
 then led to the discovery of the handgun, giving rise to
 probable cause that a crime had been committed. Within the
 ten-minute duration of the stop, events unfolded in such a
 way that altered both the purpose of the stop and the needs
 arising from it.
 
 15
 
          III.
 Conclusion
 
 
          ¶29
 For these reasons, we reverse the district court's order
 suppressing all evidence seized from the search, including
 the evidence derived from the search. We remand the case to
 the district court for further proceedings.
 
 
 ---------
 
 
 Notes:
 
 
 [1] The issue in this C.A.R. 4.1
 interlocutory appeal is as follows:
 
 
 1. Did [the] police have an objectively reasonable
 belief that the occupants of the car were armed and dangerous
 where (among other things) the officers were in a high-crime
 area, the officers saw the occupants moving things around the
 car in response to the stop, and the officers discovered that
 the passenger had recently been arrested for POWPO?
 
 
 ---------